REVIEW OF U.S. VS ONE CESSNA AIRPLANE & $259,717.00 US CURRENCY

SEPTEMBER 8, 2015

SUBMITTED TO:   C. LEVI MARTIN
                ASSISTANT UNITED STATES ATTORNEY
                UNITED STATES DEPARTMENT OF JUSTICE
                DISTRICT OF WYOMING
                CHEYENNE, WYOMING  82003-0668


PERTAINING TO:  USDC-WY-14-CV-151-J


PREPARED BY:    DAVID A. TYREE
                SPECIAL AGENT
                UNITED STATES DEPARTMENT OF JUSTICE
                DRUG ENFORCEMENT ADMINISTRATION
                1205 AIRPORT PARKWAY
                CHEYENNE, WYOMING

Exhibit C

**INTRODUCTION:**

I, David A. Tyree, am a Special Agent with the United States Department of Justice's Drug Enforcement Administration (DEA) presently assigned to the Cheyenne, Wyoming Resident Office.  I was hired by the DEA in September of 1998 and I now have 18 years of experience as a DEA Special Agent.  From 1999 to 2004, I was stationed in Albuquerque, New Mexico.  From 2004 through 2012, I was stationed in Portland, Oregon.  From 2013 through June of 2016, I was assigned as the Assistant Country Attaché to the United States Ambassador in Lisbon, Portugal.  From January of 2013 through June of 2016, my area of responsibility was Portugal, Cape Verde, Africa and Guinea Bissau, Africa.  During that same time, I was the United States' law enforcement liaison to the Maritime Analysis Operations Center - Narcotics (MAOC-N), which is a law enforcement intelligence sharing platform with both law enforcement and foreign military representation from Portugal, Spain, Italy, France, Ireland, the United Kingdom and the Netherlands, which is based in Lisbon, Portugal.   While assigned to the MAOC-N, I participated in the coordinated interdictions of over 20 tons of cocaine destined for Europe or West Africa.  While stationed in Portugal and working with the Portuguese Judicial Police, I participated in both drug trafficking and money laundering investigations involving Portugal, Turkey, Egypt, Morocco, Spain, the Netherlands, Brazil, Colombia and elsewhere.  On June 22, 2016, I reported to the DEA Cheyenne, Wyoming Resident Office.  My primary role as a DEA Special Agent is to investigate federal crimes related to violations of Title 21 and Title 18.  Prior to my employment with the DEA, from 1996 through 1998, I was a United States Pretrial Services Officer Assistant.

When I was hired by the DEA, I initially received sixteen weeks of training at the DEA Academy in Quantico, Virginia where I learned to identify various types of controlled substances by sight and odor; the way in which controlled substances are packaged, marketed, and consumed; drug testing; informant handling; evidence handling; search and seizure law; law involving conspiracy; and surveillance and investigation techniques.  In the course of my 18 year career with the DEA, I have been the affiant of, and/or participated in, over 100 search warrants involving the seizure of controlled substances, documents associated with the sale of controlled substances and documents related to the proceeds derived from the sale of illicit drugs, including over $2,000,000 in US currency.  I have attended separate advanced training sessions for asset forfeiture and financial investigations.  I am a facilitator and trainer for the United States Department of Justice's Asset Forfeiture and Money Laundering Section's "Basic Financial Investigations" seminar.  I have facilitated this course in the United States, Portugal and South Africa.  I have also provided training on money laundering investigating techniques at the National Advocacy Center in Columbia, South Carolina and at the International Chiefs of Police annual conference in Seattle, Washington.  I have also provided training on how to interdict drugs and drug proceeds, interview and interrogation and undercover techniques.  In June of 2015, I provided training as an expert at the European Police Conference (CEPOL) regarding international drug trafficking from South America to Europe.

As a Special Agent with the Drug Enforcement Administration, I have acted in an undercover capacity on at least 50 separate occasions.  When acting in an undercover capacity, I represented

myself as a drug trafficker and purchased illegal drugs from the targets of my investigation.  Acting in an undercover capacity, I purchased both ounces and kilograms or multi-kilograms of cocaine and/or ounce and pound and multi-pound quantities of methamphetamine with the understanding that I was a re-seller of the illegal narcotics. Each and every time I purchased illegal drugs from drug traffickers, I purchased said drugs in the form of cash which I wrapped in such a way as to reflect funds from the sale of narcotics.   On multiple occasions, when acting in an undercover capacity, during which time I exchanged money for narcotics, often times in excess of $5,000 or more in currency, I packaged the money in $1,000 increments to facilitate a "quick count" by the source of supply for the narcotics purchased.  During each and every meeting in which I exchanged money for narcotics, the money was counted by the drug trafficker in $1,000 increment as opposed to a complete and thorough count.  More often than not, I would wrap a $1,000 increment of cash with rubber bands and with one bill on the outside and around the bundle to reflect the denominations within.  I know from both training and experience that this is common practice for those involved in drug trafficking.

As a Special Agent with the Drug Enforcement Administration, both in Albuquerque, New Mexico and Portland, Oregon, I was assigned to an interdiction unit.  In that capacity, I worked at the Amtrak train station, various bus stations, various airports (both public and private) and I also worked with a "hotel/motel" team conducting interdictions at hotels and motels.  While working in this capacity, I participated, either directly or indirectly, in the seizure of over 1,000 pounds of marijuana, 100 kilograms of cocaine, 100 pounds of methamphetamine and over $2,500,000 in US currency which was seized and forfeited because the currency seized were suspected of being drug proceeds.

While working in an interdiction capacity at the Amtrak train station, various bus stations public airports and with the "hotel/motel" team, I relied on the following factors when initiating a consensual encounter with an individual which would most often lead to a consensual search of the individual and/or their luggage or if the situation the execution of a search warrant for the item I sought to search.  The factors indicative of the smuggling of narcotics or the proceeds from the sale of narcotics are:

1) Method of payment for travel and/or payment for hotel/motel;
2) The time and date a ticket was purchased in relation to the time and date of travel
3) The duration of travel (e.g. turnaround time from point of origin to destination and subsequent return to point of origin);
4) Use of false names or contact information when making a reservation;
5) During contact, observations of nervous behaviors during my encounter (e.g. inability to maintain eye contact, answering my general questions by re-stating my question, visibly shaking or sweating, etc.);
6) When attempting to interdict drugs, I focused on the point of origin (e.g. a source location for the production of illegal drugs, typically the Western and Southwestern portions of the United States);
7) When attempting to interdict drug proceeds, I focused on west bound travel (e.g. New York or Chicago, IL as a point of origin and Los Angeles, CA or San Diego, CA as a destination, etc.) because drug money needs to be transported from the location of sales back to the source locations in the Western and Southwestern portion of the U.S;

8) Multiple communication devices. Drug trafficking organizations are hyper-vigilant about avoiding law enforcement detection. To that end, it is common practice for those involved in a drug trafficking organization to use multiple communication devices and methods of communication to avoid detection from law enforcement. These communication devices are often referred to as "burner" phones.

While working in Portland, Oregon, I participated in over 25 marijuana cultivation and distribution investigations, many of which involved in the cultivation and interstate distribution of marijuana from the Pacific Northwest to other parts of the United States. I know from both training and experience, that the price per pound of marijuana dramatically increases from the point of cultivation to when it is sold, specifically when it is produced in the Pacific Northwest and then sold in other parts of the United States. I know that the same pound of marijuana produced in the Portland, Oregon area would retail for between $2,000 to $2,500 per pound and that the same pound would sell in New York for between $6,000 and $6,500 per pound.

While working in Portland, Oregon, I can recall an investigation in which I specifically targeted an individual who was suspected of trafficking marijuana and the proceeds from the sale of marijuana in his private airplane. On or about May 10, 2006, I can recall arresting the target in this investigation, who was a pilot and also a machinist. At the time of the initial arrest, after observing the target exit his private aircraft with a duffle bag, I contacted and arrest the target after smelling the odor of raw marijuana emitting from the target's vehicle. A search of the target's vehicle incident to arrest resulted in the location and seizure of a very small amount of marijuana and over $3,000 in US currency from the trunk of the target's vehicle, which was wrapped in rubber bands and next to a duffle bag which also contained an open box of dryer sheets. A search of the target's house incident to arrest resulted in the location of a heat-sealing machine and additional dryer sheets. I later learned that I and the search team failed to locate approximately $40,000 in US currency which the target had hidden in the attic of the residence searched. The target was eventually arrested and charged with marijuana distribution and money laundering offenses. In the course of conducting multiple interviews in the investigation, coupled with other investigations I have conducted in the course of my career, learned that it is common practice for those involved in the transportation of marijuana and the proceeds from the sale of marijuana, to seal both marijuana and the proceeds from the sale of marijuana, in heat-sealed plastic to conceal the odor of marijuana that both the marijuana emanates as do the drug proceeds.

While working both domestically and abroad, I have cultivated source of information (SOI) at private airports who were encouraged to contact me if they observed "suspicious behavior" at the airport. As I have never worked at a private airport, I relied on the industrial knowledge of the private airport employees to educate me as to what was "normal behavior" and what was "abnormal behavior" for private aircraft pilots. I learned from my sources of information that the most common behavior that was "abnormal" to airport employees was for private aircraft pilots to pay cash for fuel as opposed to a credit/debit card. I know from training and experience that those individuals who pay cash as opposed to credit card, often do so as to avoid a "paper trail." In addition, I learned from SOI at private airports that it is not a common practice for pilots to not submit a flight plan in advance of travel. I was advised that legitimate pilots are

concerned about logging "flight time" as evidence of their proficiency as pilots and to not submit a flight plan could diminish the pilot's ability to prove training and experience as a pilot.

As stated above, I have participated in the seizure of over $2,000,000 in suspected drug proceeds. These seizures have been the result of either ongoing investigations or interdictions conducted. I know from my direct participation in these investigations, that drug traffickers use various ways to conceal drug proceeds while transporting same. The methods in which I have seen drug proceeds concealed varied depending on method of transportation (e.g. public transportation versus private transportation). I have seized drug proceeds from couriers for drug trafficking organizations which were hidden in food packages, secreted into stuffed animals, sewn or hidden inside clothing, or concealed inside luggage. On one occasion, I participated in an interdiction of drug proceeds from a passenger traveling West on the Amtrak train in Albuquerque, New Mexico. The money courier had placed approximately $1,800,000 in two Fed-Ex boxes and the target abandoned both boxes during the course of encounter. When I have seized suspected drug proceeds from drug-money couriers, the money has typically been packaged in increments (e.g. $1,000; $5,000; $20,000, etc.) to facilitate a "quick count." I know from both training and experience that drug-money couriers are responsible for transporting the drug proceeds from their point of origin to their final destination but they are rarely allowed to count the money they are transporting. They are a courier and their role is to simply transport the drug proceeds. I know that if there is a discrepancy in the amount in what they are transporting and what is supposed to be delivered, the courier is held accountable for the loss and can often times be either tortured or killed if they are suspected of stealing a portion of the money. To avoid this possibility, I know from training and experience that it is common for the drug trafficking organization to seal the money in such away (e.g. heat-sealed bags or a locked bag with a combination lock) to prevent any such theft. If the heat-sealed bag is tampered with, that would be evidence that the courier had taken some of the drug proceeds and thereby expose him or herself to retaliation. Therefore, the packaging of drug proceeds is a significant element to examine when investigating a drug trafficking organization. To further illustrate the dangers that money couriers expose themselves to it was my practice and the practice of my interdiction teams to provide both a receipt and a business card to an individual when we seized suspected drug proceeds from them. I have been notified when law enforcement has investigated homicides of individuals my interdiction teams had seized drug proceeds from in which law enforcement have located business cards from members of my interdiction team on the body of the murdered individual. I have also interviewed confidential sources who have worked for Mexican drug cartels who have stated that they knew that if they were transporting drug proceeds, and those drug proceeds were seized by law enforcement, they could be subject to torture and/or death at the hands of the drug trafficking organization.

As stated above, in the course of my career as a Special Agent with the Drug Enforcement Administration, I have participated in over 25 investigations of individuals involved in the cultivation and distribution of marijuana. In the course of these investigations, which often times resulted in the arrest of individuals involved in the manufacture and distribution of marijuana, coupled with interviews of those I have arrested for the manufacture and cultivation of marijuana, I know that marijuana cultivation is a learned craft which requires those involved to be cognizant of multiple, critical factors to ensure proper cultivation which in turn nets a significant profit. Some of those critical factors include knowledge of soil, growth cycles, water

cycles, heat and light cycles and nutrients required for successful cultivation like specific fertilizers and when those fertilizers should be applied. This kind of "industrial knowledge" that those involved in the cultivation and distribution of marijuana has led me to conclude that those who were involved at some point in the cultivation of marijuana will acquire a certain, unique set of skills in the world of drug trafficking in which they rarely engage in other types of drug manufacturing/distribution (e.g. cocaine, heroin or methamphetamine). To that end, it is a common saying in narcotics enforcement, "once a marijuana grower, always a marijuana grower." I know that marijuana cultivation and distribution as well as all drug trafficking to be a cash intensive industry which is also a high-profit endeavor.

In the course of my career as a Special Agent with the Drug Enforcement Administration, both domestically and abroad, I have participated in over 20 wiretap investigations during which communication devices of drug trafficking organizations have been intercepted. From both my training and my experience, I know that it is common for drug trafficking organizations to use coded conversations when speaking about criminal activity over communication devices. I have heard coded words in Spanish, English and Portuguese to refer to narcotics, drug proceeds and other terms criminal organizations use to continue in their ongoing criminal activity. I know that drug trafficking organizations use these terms in an attempt to avoid detection from law enforcement.

**INVESTIGATIVE REVIEW:**

At the request of C. Levi Martin, Assistant United States Attorney, District of Wyoming, I reviewed:

1. Cody, Wyoming Police Report marked Lewis-RFP1-00958 through Lewis-RFP1-01003.

2. Document referred to as Lewis-RFP1-00473 which details a traffic stop in the State of Oregon which resulted in the execution of search warrants in Humboldt County, California.

3. A DEA report of investigation prepared by DEA Special Agent Richard Fraga, written to DEA case BC-10-0009 in which Scott Lewis and others are reported as arrested from 1330 Madrone, Eureka, California subsequent to the execution of a search warrant which resulted in the seizure of over 200 pounds of marijuana, scales and packaging materials, and false identifications.

4. Documents referred to as "Counterfeit DLs.PDF and "r_IDS of Wiles and Lewis.pdf

5. 12 Photos of the $259,717 United States currency referred to as IMG_0397.JPG through IMG_0410.JPG.

6. 23 photos from the search of the hotel room 110 of the Holiday Inn Hotel, located at 1701 Sheridan Avenue, Cody Wyoming referred to as IMG_0369.JPG through IMG_0391.JPG

7. Jail calls of Scott Lewis, referred to as 10.63.21-7FAAE0000A3F00151.

## ANALYSIS

The seizure displayed facts of the $259,717 is indicative of proceeds of illegal drug smuggling because:

1. A review of the Cody, Wyoming Police report marked Lewis-RFP1-00958 through Lewis-RFP1-01003 was demonstrative of the facts and circumstances which led investigators to search hotel room 110 of the Holiday Inn Hotel, located at 1701 Sheridan Avenue, Cody Wyoming. The information contained in the report which resulted in the search of the hotel room and subsequent seizure is in my opinion, an outstanding example of how behaviors outside of what would appear "normal behavior" for pilots can often time be indicators for criminal activity. As demonstrated in the aforementioned report, the facts and circumstances which led to the arrest of Scott Lewis and the seizure of the $258,520 from the locked luggage and the $1,467.00 seized from the hotel room lead me to conclude that Scott Lewis was involved in the transportation of drug proceeds via private aircraft and that the $258,520.00.00 is drug proceeds and the $1,467.00 was payment or partial payment for Lewis' services and also drug proceeds. It should be noted that although Lewis' aircraft had been placed in a hanger at the airport, where security of aircraft if paramount, Lewis removed the luggage that contained the $258,520 and maintained custody of same in his hotel room for the duration of his time in Cody, Wyoming. It should also be noted that the piece of luggage which contained the $258,520 US currency was locked with a combination lock. I know from training and experience that drug and drug money couriers often times do not have direct access to the drugs or drug proceeds they are transporting. This is demonstrated both in the aforementioned report and further demonstrated by the 23 photographs from the search of Holiday Inn hotel room 110, 1701 Sheridan Avenue, Cody, Wyoming in which one can observe other cash, not from the heat-sealed bags inside of the locked luggage, which I believe to be funds Lewis was provided by membership of the drug trafficking organization to fund and support Lewis' transportation of the $258,520 US currency which I believe to be the proceeds of narcotics trafficking, specifically marijuana.

2. A review of the report(s) referred to as Lewis-RFP1-00473 and DEA Special Agent Richard Fraga's report which detail the arrest of Scott Lewis from 2010 from a residence in Humboldt County, California, incident to a search warrant in which over 200 pounds of marijuana were seized, in addition to packaging materials, scales and other indicia of drug trafficking. This information demonstrates that in 2010, Scott Lewis was involved in the interstate transportation and distribution of marijuana.

3. A review of the documents referred to as "Counterfeit DLs.PDF and "r_IDS of Wiles and Lewis.pdf. I know from both training and experience that those individuals involved in the transportation of narcotics and/or proceeds from the sale of narcotics, often use false identification to avoid detection from law enforcement. Scott Lewis had been arrested in 2010 for his involvement in a narcotics related investigation and I believe, Scott Lewis was concerned that if his travel via private aircraft or any other type of travel was in anyway linked to his criminal history, it might alert law enforcement to his ongoing criminal activity.

4. A review of 12 Photos of the $258,520 United States currency from the images from IMG_0397.JPG through IMG_0410.JPG. The manner in which the currency was placed in heat-sealed plastic bags is indicative of the smuggling of drug proceeds from the sale of marijuana. The fact that there were instructions as to what to do with the money (specifically, an amount of money labelled "Deposit 1" and an amount of money labelled "Deposit 2") is indicative of money laundering. I know there are three phases of money laundering, referred to as the "placement, layering and integration" phases. The fact that the instructions were to "deposit" the currency and that the deposits are numbered is indicative of money laundering as the currency was most likely destined for bank accounts in which the money could be laundered. I know from training and experience drug trafficking organizations often use bank accounts that are "cash intensive" accounts or at least they are represented as "cash intensive" accounts when opened with the bank as to avoid detection from either the banks anti-money laundering units and/or law enforcement.

5. A review of 23 photos from the search of the hotel room 110 of the Holiday Inn Hotel, located at 1701 Sheridan Avenue, Cody Wyoming. The manner in which the heat-sealed currency was contained inside of a locked piece of luggage, coupled with the 15 mobile phones seized and false identification for Lewis. The manner in which the money was both packaged and stored is indicative of the smuggling of drug proceeds.

6. A review of jail call of Scott Lewis referred to as 10.62.0.21-7C38EFBB0A3E00155A67021D6F9E0B1D. In the initial part of the conversation between Scott Lewis and an unidentified male after a brief greeting, Scott Lewis asks "How is Mr. Marley doing." I know from training and experience that "Mr. Marley" is a coded term for marijuana and typically bulk quantities as the reggae singer Bob Marley is known for smoking very large marijuana cigarettes. In the course of the recorded phone call, Scott Lewis explains that he was taken into custody at this hotel by police and explains that he (Scott Lewis) is providing the details so that they can be "passed on." Scott Lewis explains, "there are two of us, just so you know" and then explains where he was arrested. At no point in the conversation does Scott Lewis explain that law enforcement had located and seized the $258,520. The unidentified male Scott Lewis is speaking with gives instructions to Scott Lewis as to how to engage law enforcement. Scott Lewis speaks about getting information to legal counsel. In the course of the conversation, Scott Lewis tells the unidentified male on the other end of the call Scott Lewis says that upon his return "home" he says he will start "driving cars full time and take care of Marley when you need me to" and the caller responds, "yea, come see me quick" and both laugh. Based on my training and experience, I believe this is a reference to Scott Lewis transporting marijuana via car and also tending a marijuana cultivation operation. Towards the very end of the conversation, after casual conversations about a common friend and other casual conversation, Scott Lewis said that everything was "super normal, um…standard operating procedure" and later said he did not know "what they could even be mad at me for, you know, there is nothing really there" and then said "but maybe some docs that Buddy will be interested about, so" to which the unidentified caller clarified, "Some docs" and Lewis replied, "Some docs - he'll know." Scott Lewis, as he is terminating the call, tells the unidentified individual, "Give Marley a big hug for me." I believe, based on training and experience, that Scott Lewis is using the coded

term "docs" to refer to the $258,520 in drug proceeds and that Scott Lewis' second reference to "Marley" is a second reference to marijuana.

7. A review of jail call of Scott Lewis, referred to as 10.62.0.21-89D627DE0A3E0015A67021D9545147C: In this call, in which both Scott Lewis and the unidentified caller are advised that the call is being recorded, Scott Lewis refers to the unidentified male voice on the other end of the call as "buddy." Scott Lewis explains that he is going to be released but states that he intended to meet with detectives to get his "actual personal phone" from the police when as noted in the Cody Police reports, the police seized 15 mobile phones. Scott Lewis makes no reference to this fact during the course of the call. Scott Lewis attempts to arrange future contact with the unidentified individual he is speaking with and refers to this individual as "brother." However the unidentified individual, when attempting to coordinate future communication via email, refers to his email address by "my first name dot 55 dot last name at gmail." The fact that the unidentified caller does not state his first or last name is, based on my training and experience, evidence that he is part of the criminal organization and wants to avoid detection from law enforcement or association to the $258,000 seizure.

8. A review of jail call of Scott Lewis, referred to as 10.63.0.21-7AAE0000A3F00151E69555FA88823FA2. Towards the end of this phone call which is between Scott Lewis and an unidentified male, Scott Lewis asked the unidentified individual if the unidentified individual notified "the wife" and the unidentified male said he did not "specifically" indicating that it was "hard to speak right now." I interpret this to be due to the fact that the unidentified male knew he was on a recorded line. Later towards the end of the conversation, the unidentified male Scott Lewis was speaking with said, "tough luck for Mr. Marley. Furthermore, I believe that the comment by the unidentified male, stating, "Tough luck for Mr. Marley" is a coded reference to the impact that the law enforcement seizure of the $258,520 US currency will have to the drug trafficking organization. I know from training and experience that when a drug trafficking organization has money seized by law enforcement, it can be difficult for the drug trafficking organization to recoup those losses.

## CONCLUSION

Upon review of the information provided, coupled with all of the facts and circumstances I learned about this investigation, combined with my law enforcement experience, the $258,520 seized and the remaining $1,467 (totaling $259,717.00 in US Currency) are the proceeds from the illegal sale of controlled substances and/or moneys intended to be used to facilitate the illegal sales of controlled substances.


*/s/ David A. Tyree*
David A. Tyree
Special Agent
United States Drug Enforcement Administration