IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : |  |
| Plaintiff, | : |  |
|  |  | No.  14-CV-151-J |
| vs. | : |  |
|  |  |  |
| ONE CESSNA AIRPLANE, TAIL NO. | : |  |
| N6214V & $259,717 U.S. CURRENCY, |  | Report of Kenneth R. Wallentine |
| Defendants. | : |  |

_____

The following report of Kenneth R. Wallentine is submitted after reviewing the following documents, pleadings, records, and reports:

Complaint for forfeiture

Cody Police Department reports case number 14-180

Powell Police Department reports case number 14-251

National Police Canine Association Certifications for PSD Zeke for January 2014 and May 2014

Department Training & Deployment Records for PSD Zeke for 2013 and 2014

National Police Canine Association Standards and Certification manual

*U.S. v. Cessna & $259,717*
*Report of Kenneth R. Wallentine*          1                              **Exhibit E**

Kenneth R. Wallentine states as follows:

1. In the instant matter, I have relied upon the documents, pleadings, records, reports, and statements previously described. I have formed a number of opinions based upon the aforementioned, as well as my experience, education, and familiarity with professional publications. I have relied on a variety of professional publications, including, but not limited to, my own publications and court decisions cited therein. My opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows.

**Incident synopsis:**

On February 27, 2014, Cody Police Department Detective Parduba learned that two men, the pilot and a passenger, landed a small two-seater Cessna airplane at the Yellowstone Regional Airport in Cody, Wyoming. The men parked the Cessna at the Choice Aviation aircraft hanger. The men removed several bags from the Cessna and took a shuttle van to a local Holiday Inn. Based on information provided by airport staff and certain records checks, Detective Parduba became suspicious that the men and the plane could be involved in illegal activity.

Powell Police Department police service detector dog handler Reece McLain was dispatched to administer a detector dog sniff in the Choice Aviation hanger. Midmorning on February 28, 2014, Officer McLain took his police service detector dog Zeke to the Choice Aviation aircraft hanger. Officer McLain and police service detector dog Zeke were certified in the detection of the odor of marijuana, cocaine, methamphetamine, heroin, and MDMA (3,4-methylenedioxy-N-methylamphetamine, commonly compounded as "ecstasy"). The

certification testing was administered by officials of the National Police Canine Association on January 21, 2014, just five weeks prior to this incident.

Officer McLain deployed Zeke to sniff the exterior of the Cessna airplane. Zeke sniffed the exterior in a counter-clockwise direction, beginning with the left front of the Cessna. As Zeke sniffed the Cessna's left side, Zeke exhibited noticeable changes of behaviors, indicating to Officer McLain that Zeke was sensing odors and was intently sniffing for the source of the odors. At the left door, Zeke sniffed with a closed mouth. Officer McLain focused Zeke on the door. Zeke sniffed deeply and gave a positive final response to the odor of a controlled substance by sitting, the behavior that Zeke has been trained to use to signal that he has reached the source of odor or the most profound odor available to him.

Officer McLain then directed Zeke to the right side of the Cessna, near the tail. Zeke sniffed the landing gear. He then made another significant change of behavior, closing his mouth and sniffing intently at the underside of the Cessna. Zeke sniffed the upper and lower landing struts. He changed direction as he again approached the underside of the plane, moving to the right door seam. At the right door seam, Zeke gave a positive final response to the odor of a controlled substance by sitting. Having completed the sniff, Officer McLain left the hanger.

Some time later, Judge Bruce B. Waters issued a search warrant for the Cessna. Asked to assist with execution of the warrant, Officer McLain returned with Zeke to the Choice Aviation aircraft hanger. Officer McLain deployed Zeke to the open door on the right side of the Cessna. Zeke jumped in to the Cessna. Zeke walked toward the front of the plane, then abruptly turned. Zeke closed his mouth and began sniffing intently toward the rear, or cargo area, of the Cessna. Zeke showed particular interest at the left part of the right door and rear area of the Cessna.

a. **The sniffs of the exterior and interior of the Cessna were conducted in a manner consistent with actions of reasonable, well-trained police service detector dog teams.**

1. The method of sniffing an airplane is similar sniffing a vehicle–something that Zeke had done many times in training and in field deployments. Most detector dog handlers follow a particular pattern for an exterior sniff, though environmental conditions (particularly wind and traffic) may prompt a variance. It matters not whether the sniff begins on the right or left, front or back. Officer McLain directed Zeke to sniff beginning at the left front, moving counterclockwise.

2. During the exterior sniff, Zeke exhibited changes of behavior indicating that he had detected an odor. Officer McLain observed, at one point directing (or "detailing") Zeke to focus his sniff on the top of the left door seam. The dog has a profoundly greater ability to detect odors, but not much of an ability to understand the mechanics of getting into a plane. Typically, a handler is able to identify the physical features of a vehicle, plane, container, etc. that are most likely odor transmission points. In other words, the human part of the team is far better suited to see the door seam and recognize the door seam or window or whatever physical opening as the leak point of the odor that the detector dog part of the team has identified and is seeking.

3. The description of the progress of both the exterior and the interior sniffs of the Cessna comports with just what one would expect. Officer McLain established the initial pattern (counter-clockwise from the left front) and then carefully observed Zeke for changes of behavior consistent with locating and pinpointing the source

of odors Zeke is trained to detect.  Such changes of behavior generally include the dog moving from general sweeping behavior to isolated and localized sniffing (often with closed-mouth deep sniffs), an increase in intensity of the sniffs, deep inhalation sniffs, bracketing of sniffing, physically leaning the body axis forward, raising the body fully erect, ear and tail set changes, changing nose position and orientation, visible energy increase as the dog becomes excited by getting closer to the source of the odor, speed of movement and other changes.  The expert best suited to interpret these changes of behavior is the person who spends the most time working and training with the dog.  That person is almost always the handler.

4. Officer McLain reported his observations of Zeke's changes of behavior, such as closing the mouth, inhaling more deeply, active sniffing, changing direction abruptly.  These obvious and apparent changes of behavior corroborate that Zeke was performing consistently with his training and consistently with the behavior expected of a well-trained and reliable detector dog.

b. **At the time of the sniffs of the Cessna, police service dog Zeke was well-trained, had demonstrated reliability in field deployments and training and was properly certified as a drug detector dog by a credible, nationally-recognized certification and training authority.**

1. On January 21, 2014, a few short weeks prior to the sniff of the Cessna, Zeke and his handler, Officer McLain , successfully completed a certification trial (testing procedure) administered by qualified examiners from the National Police Canine Association.  Zeke and Officer McLain were certified in the detection of the odors

2. of illegal controlled substances. The certification is valid for one year. Thus, Zeke and Officer McLain were certified as a detector dog team on the date of this incident.

2. The National Police Canine Association has established certification standards that are consistent with the principal national and regional police canine associations, such as the North American Police Working Dog Association, United States Police Canine Association, Heart of America Police Dog Association, the National Narcotic Detector Dog Association, and others. I am personally familiar with the certification standards of these organizations and have recently reviewed these standards, as well as standards promulgated by several regional police dog associations in the course of consulting on modifying a particular organization's certification standards. I am personally familiar with the credentials of several national leadership office holders in the National Police Canine Association and am confident of their commitment to continuous improvement in standards and certification.

3. The method of administering the National Police Canine Association certification trial to a handler/dog team is a single blind test. That method is used by all credible national and regional police service dog organizations that administer detector dog certification trials and is it consistent with currently-accepted best practices in the detector dog world.

4. Zeke and Officer McLain successfully completed the National Police Canine Association certification trial in January 2014, just prior to sniffing the Cessna.

Zeke produced no false results or other disqualifying events. Zeke and Officer McLain successfully completed another National Police Canine Association certification trial in May 2014, again with no errors or faults noted.

5. Maintenance training is critical to the success of a police service dog program. A detector dog's field performance is dependent on regular reinforcement of skills developed during the basic training course. Officer McLain's training and deployment records show that Zeke successfully negotiated situations with distraction odors, occasionally acknowledging them, but not ceasing searching or focusing on the source of the distraction odors. In addition to training with distraction odors in the area, Officer McLain commanded Zeke to search without specific direction and detailing. He sent Zeke to search while Officer McLain walked away and a second officer observed whether Zeke continued to search without Officer McLain (Zeke did).

6. Officer McLain followed best practices for drug detection maintenance training. He formally associated himself with a recognized training and accreditation organization, the National Police Canine Association, and regularly attended annual handler and dog training sessions. Officer McLain used other officers to hide substances so that Officer McLain could deploy Zeke to search for the odors of illegal drugs hidden in various locations, with various distractors, behind various obstacles, and all having been concealed by other persons outside of Officer McLain's and Zeke's presence. This is known as blind testing and it is an accepted best practice for drug detector dog maintenance training. Officer McLain also

participated in training seminars presented by an independent entity where items with drug odors were placed in blind testing circumstances.

7. Officer McLain also followed best practices in "proofing" Zeke on the odors of packaging material, common masking/distraction agents, United States currency, dog food, dead game animals, a Kong play toy, tennis balls, towels and other items. "Proofing" is a method used in training to ensure the detector dog alerts only to the odors for which it is trained to detect and then provide a positive final response.[1] Items with the odor of the proofed substance, or the proofed substance itself, are placed the training search area. Officer McLain and his training partner officers did this often.

---

[1] An explanation of terminology generally accepted in the scientific and professional detector dog community may be helpful to the Court. Publications and court decisions use the terms "alert," "change of behavior," "indication" and "final response" in varying contexts. The Scientific Working Group on Dog and Orthogonal Detector Guidelines (SWGDOG), an international group of detector dog experts, scientists and trainers, convened by the Federal Bureau of Investigation and the Transportation Security Administration, undertook a project to unify terminology. As used in this report, an "alert" means a characteristic change in ongoing behavior in response to a trained odor, as interpreted by the handler. The components of the alert may include: change of behavior, interest, and final response or indication. It is the handler's responsibility to report when the dog has alerted or given an indication and identity what behavior the dog uses to do so (the response). The term "alert" is often used to define the handler's interpretation of the dog's behavior. As used in this report, a "change of behavior" means a characteristic pattern of behaviors, as interpreted by the handler, that occurs when the dog detects a trained odor. As used in this report, an "indication" means the dog's response to the odor in the manner in which it has been trained, independently, and without distraction. This differs from other olfactory interests that otherwise are exhibited by the dog in response to the daily environment. The pattern of behavior may be unique to each dog. A "final response" is a behavior that a dog has been trained to exhibit in the presence of a target odor source. This behavior may be either passive (sit, stare, down, point, etc.) or active (bite, bark, scratch, etc.). An absence of a final response does not necessarily negate any behavioral responses given earlier in the alert sequence. Therefore, absence of a final response does not mean a target odor is not present.

*U.S. v. Cessna & $259,717*
*Report of Kenneth R. Wallentine*                8

8. Officer McLain followed best practices in investigating to confirm Zeke's indications. In my review of field deployment records for Zeke, I noted the significant *infrequency* of a deployment where Officer McLain documented a positive final response and no drugs or drug paraphernalia were found. In those few deployments where there was a positive final response, or even an indication, and no drugs were found, Officer McLain actively investigated the circumstances. For example, when Office McLain and Zeke were called to administer a sniff of a home, garage and vehicles, Zeke alerted to two motorcycle saddle bags. No drugs were found in the saddle bags. However, during the subsequent investigation, the suspect admitted to transporting methamphetamine in the saddle bars. The odor of the illegal drug lingered in the saddle bags. On another occasion, Officer McLain and Zeke were called by an officer to administer a sniff of a stopped vehicle. Zeke intently sniffed the passenger compartment, but no drugs were found there. Just a moment later, the suspect who had been sitting in the passenger compartment surrendered a quantity of marijuana to the officers. Though the drugs had been removed from the car, the odor had been absorbed by the carpet, upholstery and other porous components of the car, and the odor continued to linger in the car. Detector dog trainers and handlers, as well as courts throughout the nation, recognize that trained detector dogs are capable of detecting the lingering odor of drugs on vehicles, airplanes, clothing or just about any item that has come in contact with drugs, even though no seizable quantity of drug may be found. Officer McLain's training records show that he even followed up to return to a

former training site where Zeke located hidden drugs and the drugs were removed. Officer McLain assessed whether Zeke is sniffing for odor or searching from memory (he didn't search from memory).

2. In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career. A summary of my qualifications, publications, litigation history and fee schedule are recited herein.

3. **My qualifications as an expert in this subject matter include the following:** I am a law enforcement officer in the State of Utah. I became certified as a law enforcement officer in the State of Utah in 1982. Until April 1, 2014, I was employed with the Utah Attorney General, where I served as the Chief of Law Enforcement. I am currently employed as a Special Agent with the Utah Attorney General Investigation Division, where I coordinate a statewide use of force training initiative and coordinate officer-involved shooting investigations and other special investigations. I also serve in a consultation role as Senior Legal Advisor for Lexipol, the nation's leading provider of law enforcement risk management resources.

I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah. I also supervised the police service dog training and certification program for the State of Utah. I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.

My duties included direct supervision and command of various investigative units and agents throughout the State of Utah, supervising law enforcement officers, forensic specialists, and technicians. I commanded the State of Utah Child Abduction Response Team. I commanded the State of Utah Officer-Involved Fatality Investigation Team. I am a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations. In 2010, Governor Herbert selected me for the Governor's Leadership in Public Service award for my work in public safety leadership.

4.     I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability. I regularly teach in the Basic Training programs of the Utah State Police Academy. I regularly teach in the following specialized courses: Advanced Officer Course, Firearms Instructor Course, Utah Drug Academy, Utah Crime Scene Investigators Academy, Utah Sheriffs' Association Command College, First Line Supervisor Course, POST K9 Unit Administrator Course, POST Patrol Dog Handler Course, POST Narcotics Detector Dog Course, and others. I am a former police service dog handler and worked with the Uintah County Sheriff's K9 Unit from 1995 to 2001. I continue to provide instruction and evaluation services for the POST Police Service Dog program. I am a certified POST Firearms Instructor, often serving as the lead instructor for POST Firearms courses. I am certified by the Force Science Research Center as a Force Science Analyst ®. I am

a certified TASER® Instructor. I am a certified Excited Delirium and Sudden Death Investigation Instructor. I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation. In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems.

5.      I am a licensed attorney, having practiced law since 1990. I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court. I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities. I was formerly on the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety.

6.      In addition to my primary employment, I occasionally consult and provide expert witness opinions on police procedures, and use of force issues. I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies. I am the co-founder of, and legal advisor to, a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies. These policies serve as a model for all

Utah public safety agencies. I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies. I have served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

7. I participate and serve in a number of community and professional capacities. Professional activities pertinent to law enforcement include serving as a Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member of the International Association of Law Enforcement Educators and Trainers Association, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators and Trainers Association, member of the K9 Section of the Utah Peace Officers Association, member of the United States Police Canine Association, past member of the board of directors of the NAACP, Salt Lake City branch, and board member and immediate past-Chairman of the Utah Law Enforcement Legislative Committee. I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training. I am a former member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University. I

have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police and the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

8.    Since 1994, I have been a consultant with the K9 Academy for Law Enforcement and the International Police Canine Conference.  My principal responsibilities are to provide use of force training, civil liability instruction, and search and seizure instruction.  I have provided police service dog training and certification standards consultation for two police service dog organizations, including a western regional group and one of the major national groups.  I serve as a consultant for the California Narcotic and Explosive Canine Association and have been a featured lecturer at their annual training conference over the past decade.

9.    I am Vice-President and Senior Legal Advisor for Lexipol, Inc., the nation's largest provider of policy formulation and revision for public safety agencies and policy-based training, responsible for reviewing and editing the work of legal staff in creation of policy manuals for law enforcement agencies.  In that capacity, I have assisted in the drafting and review of use of force and police service dog policies in current use by more than 1,800 police agencies and correctional facilities in the United States.

10.    **My publications (limited to ten years) include the following:**  I have previously published a number of other professional articles, many of which have been subjected to peer review.  My most recent book, *The K9 Officer's Legal Handbook*, 2nd ed., was published by Lexis/Nexis Matthew Bender in February 2014, with a 2015 Supplement published in February 2015, and a 2016 Supplement in preparation for publication.  It includes an extensive discussion

of use of force by police officers.  Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, was published in 2007 by the American Bar Association Publishing Division.  It is a treatise on public safety and criminal procedure, and includes multiple chapters on search and seizure and use of force by police officers.  My other published works, limited to the past ten years, include:  *Armstrong v. Village of Pinehurst: Training and Policy Implications for Police*, Police Chief, V. 83, No. 6 (2016); *Supreme Court Decision Casts Doubt on Hotel Registry Ordinances*, Police Chief, V. 81, No. 10 (2015); *Body Worn Cameras: Plan Before Your Office Buys In*, The Sheriff (June 2015); *Legal Risks of Failing to Care for Children of Arrested Persons*, Police Chief, V. 81, No. 10 (2014);  *A Rational Foundation for Use of Force Policy, Training and Assessment*, 2014 (2) AELE Mo. L. J. 101; *Post Incident Video Review*, Police Chief, V. 68, No. 12 (2011);  *Cell Site Location Evidence: A New Frontier in Cyber-Investigation*, 2011 (2) AELE Mo. L. J. 501,  *Prospects, Pitfalls and Pains of Social Media and Public Safety*, The Municipal Lawyer, September 2010; *Police Department May Read Text Messages Sent on Agency-issued Pagers: City of Ontario, California v. Quon*, Police Chief, V. 57, No. 8 (2010); *Collection of DNA Upon Arrest: Expanding Investigative Frontiers*, Police Chief, V. 57, No. 1 (2010); *Targeting TASER: The New TASER Aim Points,* Law Officer, January 2010; *The Risky Continuum: Abandoning the Use of Force Continuum to Enhance Risk Management*, The Municipal Lawyer, July 2009; *Explosive Detector Dog Legal Issues*, K9 Cop, February 2009; *Does Police Service Dog Deployment Equal Deadly Force?*, K9 Cop, April 2009; *Human Scent Line-up Evidence*, Police K9 Magazine, August 2009; *Acknowledging Gender in Fitness Standards for Police: An Invitation to Liability?*, The Municipal Lawyer, January 2008; *K9 Court Testimony*, Police K9, December

2006; *United States Supreme Court Review for Corrections Managers*, Corrections Managers Report, October 2006.  I am the author of a reference book currently in use in the Utah Law Enforcement Academy, as well as other police academies throughout the United States, titled *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005).  This book discusses detention and arrest of persons, use of force, and search and seizure of persons and property, among other subjects.

11.     **My fee schedule is established as follows:** I charge $250.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony, with a minimum of $1,000.00 for deposition or court testimony.  I bill for actual travel expenses and a travel fee of $1,000.00 per day/part-day for travel to western states and $1,500.00 per day/part-day outside western states.

12.     **My prior experience as an expert witness (limited to the past four years) includes the following cases:** I have been qualified as an expert in the subject matter of police procedures, including use of TASER® devices, excessive force, shootings and wrongful death claims, search and seizure, police service dog use, both in drug detection and dog bites, and I have never had a court decline to find that I am a qualified expert witness.  I have testified and/or provided depositions and trial testimony in the following cases which may be generally related to the subject of the instant litigation in the past four years: *Christiansen v. West Valley City, et al.*, No. 2:14-cv-00025, United States District Court for the District of Utah, 2016.  Trial testimony given on behalf of defendants.  Subject matter: excessive force.  *State v. Barney*, No. 161300117, Fourth District Court, State of Utah, 2016.  Trial testimony given on behalf of the prosecution.  Subject matter: use of force.  *Mims v. City of Charlotte*, No. 2014-CVS-23815, Superior Court

of North Carolina, 2016.  Deposition testimony given on behalf of the defendants.  Subject matter: wrongful death.  *United States v. Jereb*, No. 2:15-mj-00356, United States District Court for Utah, 2016.  Trial testimony given on behalf of the prosecution.  Subject matter: use of an electronic control device.  *Talley v. City of Charlotte*, No. No. 3:14 CV 683, United States District Court for the Western District of North Carolina, 2016.  Deposition testimony given on behalf of the defendants.  Subject matter: negligent custody.  *Gonzales v. Douglas*, No. CV-15-00064-PHX-NVW, United States District Court for the District of Arizona, 2016.  Deposition testimony given on behalf of defendant.  Subject matter: excessive force.  *McDonald v. Dupnik*, No. C20142895 Superior Court, State of Arizona, Pima County, 2016.  Trial and deposition testimony given on behalf of defendants.  Subject matter: excessive force.  *McKenney v. Mangino*, No. 2:15-CV-73-JDL, United States District Court for the District of Maine, 2015.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *Moore v. City of Lakeland*, No. 8:13-cv-02660-T-26TBM, United States District Court for the Middle District of Florida, 2015.  Trial testimony given on behalf of defendant.  Subject matter: excessive force.  *Frasier v. McCallum, et al.*, No. 1:14-cv-00009-MP-GRJ, United States District Court for the Northern District of Florida, 2015.  Deposition testimony given on behalf of defendant.  Subject matter: mistaken arrest.  *Wolffis v. City of Gainesville*, No. 1:14-cv-130, United States District Court for the Northern District of Florida, 2015.  Deposition testimony given on behalf of defendant.  Subject matter: excessive force.  *Castillo v. City of Tempe*, No. 2:12-CV-02225-ROS, United States District Court for the District of Arizona, 2015.  Trial testimony given on behalf of defendants.  Subject matter: excessive force.  *Stoedter v. Salt Lake County, et al.*, No. 2:12-CV-255-BJ, United States District Court for the District of Utah, 2015.  Trial and deposition

testimony given on behalf of the defendants.  Subject matter: police force to effect arrest.  *Williams v. TASER, Internat'l and the City of Charlotte*, No. 3:12-CV-838, United States District Court for the Western District of North Carolina, 2014.  Trial and deposition testimony given on behalf of the defendants.  Subject matter: wrongful death.  *Ali v. City of Tempe*, No. CV2013-091264, Superior Court, State of Arizona, Maricopa County, 2014.  Deposition testimony given on behalf of defendants.  Subject matter: excessive force.  *Texiera v. United States of America, et al.*, No. 2:11-CV-02022, United States District Court for the District of Nevada, 2014.  Trial and deposition testimony given on behalf of the defendants.  Subject matter: police canines.  *Clark v. Box Elder County et al.,* No. 1:13-cv-00079-CW,  United States District Court for the District of Utah, 2014.  Deposition testimony given on behalf of the defendants.  Subject matter: wrongful death.  *Chief v. West Valley City Police, et al.*,  No. 2:11-CV-643, United States District Court for the District of Utah, 2013.  Deposition testimony given on behalf of the defendants.  *Campbell & Gemperline v. City of Springboro et al.*, No. 1:08-cv-00737, United States District Court for the Southern District of Ohio, 2013.  Deposition testimony given on behalf of the defendants.  Subject matter: police canines.  *Thompson v. City of Lebanon*, No. 1:10-CV-0035, United States District Court for the Middle District of Tennessee, 2013.  Deposition testimony given on behalf of the defendants.  Subject matter: wrongful death.  *Stoedter v. Salt Lake County, et al.*, No. 2:12-CV-255-BJ, United States District Court for the District of Utah, 2013.  Deposition testimony given on behalf of the defendants.  *Boggs v. City of Waterloo*, No. LACV116584-CW, Blackhawk County District Court, 2013.  Deposition testimony given on behalf of defendants.  *Schmidtke v. Marion County Sheriff et al.*, No. 5:10-CV-293-OC- 10prl, United States District Court for the Middle District of Florida, 2012.

Deposition testimony given on behalf of the defendants. *Alusa v. Salt Lake County Sheriff, et al.*, No. 2:11-CV-00184-CW, United States District Court for the District of Utah, 2012. Deposition testimony given on behalf of the defendants. *Woodward v. City of Gallatin, et al.*, No. 3:10-CV-01060, United States District Court for the Middle District of Tennessee, 2012. Deposition testimony given on behalf of the defendants. *Minor v. Johnson, et al.*, No. 1016-CV08762, Circuit Court of Jackson County, Missouri, 2012. Deposition testimony given on behalf of defendants. *Garcia v. Sacramento City, et al.,* No. 2:10-CV-00826-JAM-KJN, United States District Court of California, Eastern Division, 2012. Deposition testimony given on behalf of the defendants. *Cavanaugh v. Woods Cross City, et al.,* No. 1:08CV00032, United States District Court of Utah, Central Division, 2011. Trial testimony given on behalf of the defendants. *Ibarra v. City of Watsonville*, Watsonville Municipal Civil Service Commission, 2011. Trial testimony given on behalf of Respondent. *Jones v. City of Waterloo*, No. 6:10-CV-02014-LRR United States District Court of Iowa, 2011. Trial testimony given on behalf of the defendants. *Cardall v. Thompson, et al.* Case No. 2:10-CV-00305-CW, United States District Court of Utah, Central Division, 2011. Deposition testimony given on behalf of defendants.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with physical evidence, that were provided to me. The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony,

consideration of any report submitted by plaintiff's experts, further investigation and/or further witness interviews. I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or diagrams, video and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.

## CONCLUSION

The records provided to me demonstrate that the sniffs of the exterior and interior of the Cessna were conducted in a manner consistent with actions of reasonable, well-trained police service detector dog teams. The records and reports of this incident, as well as the training records, deployment records and testing certifications conducted by a nationally-recognized and credible organization, demonstrate that Zeke was well-trained, had demonstrated reliability in field deployments and training and was properly certified.

Kenneth R. Wallentine
September 19, 2016